## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

|  |  |  |
|---|---|---|
| EDWIN DUFFY, Derivatively On Behalf Of MARKEL CORP., | ) ) | |
| | ) | Case No. |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| RICHARD R. WHITT, III, ANTHONY F. MARKEL, STEVEN A. MARKEL, ALAN I. KIRSHNER, THOMAS S. GAYNER, DARRELL D. MARTIN, LEMUEL E. LEWIS, K. BRUCE CONNELL, STEWART M. KASEN, MICHAEL O'REILLY, MICHAEL J. SCHEWEL, DEBRA J. WILSON, AND DIANE LEPOLD, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| MARKEL CORP., | ) ) | |
| Nominal Defendant. | ) ) ) | |

## PLAINTIFF'S SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Edwin Duffy ("Duffy"), by and through his undersigned attorneys, brings this derivative complaint (the "Complaint") for the benefit of nominal defendant, Markel Corp. ("Markel" or the "Company"), against certain members of the Markel Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties and abuse of control.

## NATURE AND SUMMARY OF THE ACTION

1.     Markel is a holding company that markets and underwrites specialty insurance products and insurance funds through its subsidiaries. Markel CATCo Investment Management

Ltd. ("MCIM"), the Company's wholly-owned subsidiary, is an insurance-linked securities investment fund manager and reinsurance manager that manages diversified, collateralized retrocession and reinsurance portfolios covering global property catastrophe risks.

2.      On December 6, 2018, the Company disclosed that it had been contacted by authorities in the United States and Bermuda on November 30, 2018 regarding "loss reserves recorded in late 2017 and early 2018 at [MCIM] and its subsidiaries."

3.      Markel's situation is not a simple accounting error or some other one-time slip-up but a pervasive failure of corporate governance extending from inadequate controls to ensure truthful and timely disclosure to improper approval of related party transactions, including insider trading.

4.      Plaintiff did not make a pre-suit demand on the Markel board because, as detailed herein, the Markel board was not disinterested and independent.  At the time that this action was brought, there were thirteen directors on Markel's board, all of whom are directly implicated in the wrongdoing after they were informed of and approved the faulty loss reserves and took no steps to correct the reserves nor even assure truthful disclosure about such reserves.  Further, six of the defendants are either current or former directors and officers who have permitted Markel to function without sufficient controls and breached their fiduciary duties thereby.  Additionally, six other directors were members of the Audit Committee that were specifically charged with the review and approval of Markel's financial reporting.  As shown below, the Company has now been gravely harmed.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 14(a) of the Securities Exchange Act of 1934.  This Court has supplemental jurisdiction over the state law claims asserted herein

pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

6. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

7. Venue is proper in this Court because Markel maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

### A. Plaintiff

8. Plaintiff Duffy is, and was at all times relevant hereto, has been an owner and holder of Markel common stock since 2008.

### B. Defendant

9. Nominal defendant Markel is a corporation incorporated under the laws of the Commonwealth of Virginia and maintains its principal executive offices at 4521 Highwoods Parkway, Glen Allen, Virginia, 23060. Markel's common stock trades on the New York Stock Exchange under the symbol "MKL."

10. Defendant Richard R. Whitt, III ("Whitt") has been a Markel director since 2016. Whitt also has been Co-Chief Executive Officer since January 2016 and President and Chief Operating Officer from May 2010-December 2015. In 2017, Whitt received compensation of $3,255,542 as Co-Chief Executive Officer.

11.     Defendant Anthony F. Markel ("Anthony Markel") has been a Markel director since 1978.  Anthony Markel has been Vice Chairman since May 2008 and President and Chief Operating Officer from March 1992-April 2008. Anthony Markel has been employed by the Company since 1964 and has been a member of its senior leadership team since it went public, with a focus on operations.  Anthony Markel is the cousin of Steven Markel.

12.     Defendant Steven A. Markel ("Steven Markel") has been a Markel director since 1978.  Steven Markel has also been the Vice Chairman since 2008.  Steven Markel has been employed by the Company since 1975 and has been a member of its senior leadership team since it went public, with a focus on finance and investments.  Steven Markel is the cousin of Anthony Markel.

13.     Defendant Alan I. Kirshner ("Kirshner") has been a Markel director since 1978.  Kirshner has also been Executive Chairman since January 2016, Chairman of the Board of Directors since 1986 since Markel became a public company, and Chief Executive Officer from 1986-2015.  Kirshner has been with the Company since 1960.  Kirshner, Anthony Markel, and Steven Markel functioned collectively as the senior leadership team since that time.  In 2017, Kirshner received $2,366,712 as Markel's Executive Chairman.  Kirshner's spouse and son-in-law are each employed by a Company subsidiary as Executive Producer and Managing Executive, respectively. In 2017 and 2018, total compensation to Kirshner's spouse was approximately $120,000. Total compensation paid to Kirshner's son-in-law was approximately $891,100 in 2018 and $1,174,950 in 2017.

14.     Defendant Thomas S. Gayner ("Gayner") has been a Markel director since 2016.  Gayner has also been Co-Chief Executive Officer since January 2016, President, and Chief Investment Officer from May 2010 to December 2015, and previously served as a director from

1998-2004.   In 2017, Gayner received $3,261,782 as Co-Chief Executive Officer of Markel. Gayner's spouse is employed by a Company subsidiary as President and Chief Executive Officer.  Total compensation paid to Gayner's spouse was approximately $352,500 in 2018 and $328,000 in 2017.   Markel's internal money management firm is the Markel-Gayner Asset Management Corp.

15.    Defendant Darrell D. Martin ("Martin") has been a Markel director since 2009. Martin has also been Executive Vice President from May 2005 to September 2009, Chief Financial Officer from 1988 to 2005, and previously served a director from 1991 to 2004. Martin's son is employed by a Company subsidiary as a managing executive.    Total compensation paid to Martin's son was approximately $651,00 in 2018 and $834,000 in 2017.

16.    Defendant Lemuel E. Lewis ("Lewis") has been a Markel director since 2007. Lewis is chair of the Audit Committee and a member of the Corporate Governance Committee.

17.    Defendant K. Bruce Connell ("Connell") has been a Markel director since 2013. Connell is a member of the Audit Committee and the Compensation Committee.

18.    Defendant Stewart M. Kasen ("Kasen") has been a Markel director since 1987. Kasen is a member of the Audit Committee and the Compensation Committee.

19.    Defendant Michael O'Reilly ("O'Reilly") has been a Markel director since 2013. O'Reilly is a member of the Audit Committee, the Compensation Committee, and the Corporate Governance Committee.

20.    Defendant Michael J. Schewel ("Schewel") has been a Markel director since 2015.  Schewel is a member of the Audit Committee and the Corporate Governance Committee.

21.    Defendant Debra J. Wilson ("Wilson") has been a Markel director since 2009. Wilson is the chair of the Compensation Committee and a member of the Audit Committee.

22.     Defendant Diane Leopold ("Leopold") has been a Markel director since 2018. Leopold is a member of the Compensation Committee and Corporate Governance Committee.

23.     The defendants referenced in ¶¶ 10-22 are collectively referred to herein as the "Individual Defendants."

### DEFENDANTS' DUTIES

24.     By reason of their positions as officers, directors, and/or fiduciaries of Markel and because of their ability to control the business and corporate affairs of Markel, the Individual Defendants owed Markel and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Markel in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Markel and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Markel and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

25.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Markel, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial, and directorial positions with Markel, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

26.     To discharge their duties, the officers and directors of Markel were required to exercise reasonable and prudent supervision over the management, policies, practices and

controls of the Company. By virtue of such duties, the officers and directors of Markel were required to, among other things:

A. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

B. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

C. Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

D. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence

27. The members of the Audit Committee, according to the Audit Committee Charter, were subject to further obligations including the review and discussion with management significant accounting matters and approving audited financial statements to be included in the Company's Annual Report.

28. The duties of the Markel Audit Committee include:

A. Review and reassess the adequacy of this charter annually and recommend any proposed changes to the Board for approval;

B. Conduct a review annually of the Committee's performance and report thereon to the Board;

C. Be directly responsible for the appointment (subject to shareholder ratification), compensation, retention and oversight of the work of the independent auditors (including resolution of any disagreements between management and the independent auditors regarding financial reporting);

D. Pre-approve all auditing services and permitted non-audit services to be performed by the independent auditor. The Committee may delegate authority for pre-approval to one or more members provided any decision

to grant pre-approval is presented to the full Committee at its next scheduled meeting;

E.  Establish hiring policies for employees or former employees of the independent auditors;

F.  Review with the Corporation's management, internal audit and independent auditors the Corporation's accounting and financial reporting controls, including any major issues as to the adequacy of the Corporation's internal controls and any special audit steps adopted in light of material control deficiencies;

G.  Review with the Corporation's management, internal audit and independent auditors (i) major issues regarding accounting principles and financial statement presentation, including any significant changes in the Corporation's selection or application of accounting principles, (ii) analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the Corporation's financial statements, and (iii) the effect of regulatory initiatives, as well as off-balance sheet structures, on the financial statements. Discuss with the independent auditors their judgments about the quality, not just the acceptability, of the Corporation's accounting principles used in financial reporting;

H.  Review the scope of internal audit's work plan for the year and receive a summary report of major findings by internal auditors and how management is addressing the conditions reported;

I.  Review the scope and general extent of the independent auditors' annual audit. The Committee's review should include an explanation from the independent auditors of the factors considered by the auditors in determining the audit scope, including the major risk factors. The independent auditors should confirm to the Committee that no limitations have been placed on the scope or nature of their audit procedures;

J.  Inquire as to the independence of the independent auditors and obtain from the independent auditors, at least annually, a formal written statement delineating all relationships between the independent auditors and the Corporation in accordance with applicable requirements of the Public Company Accounting Oversight Board (PCAOB);

K.  Obtain from the independent auditors, at least annually, a report describing: (i) the firm's internal quality control procedures; (ii) any material issues raised by the most recent internal quality control review, or peer review, of the firm or by any inquiry or investigation by governmental or professional authorities, within the preceding five years,

respecting one or more independent audits carried out by the firm and any steps taken to deal with such issues; and (iii) (to assess the auditor's independence) all relationships between the independent auditor and the Corporation;

L.      At the completion of the annual audit, review with management, internal audit and the independent auditors the following:

- results of the audit of the financial statements and the related report thereon and, if applicable, a report on changes during the year in accounting principles and their application;

- significant changes to the audit plan, if any, and any serious disputes or difficulties with management encountered during the audit. Inquire about the cooperation received by the independent auditors during their audit, including access to all requested records, data and information. Inquire of the independent auditors whether there have been any disagreements with management, which, if not satisfactorily resolved, would have caused them to issue a nonstandard report on the Corporation's financial statements; and

- Other communications as required to be communicated by the independent auditors by PCAOB Auditing Standard No. 1301: Communications with Audit Committees (PCAOB AS 1301), relating to the conduct of the audit;

H.      Receive reports from management concerning interim financial information, and the nature and extent of internal and external audit involvement in reviewing that information;

I.      Have a predetermined arrangement with the independent auditors that they will advise the Committee through its Chair of any matters that need to be communicated in accordance with PCAOB AS 1301. Such notification is to be made prior to the related press release or, if not practicable, prior to filing Form 10-Q;

J.      Discuss with the independent auditors the responsibilities, budget, staffing and quality of the Corporation's financial, accounting and internal audit personnel;

K.      Review with management, internal audit and the independent auditors the methods used to establish and monitor the Corporation's policies with respect to unethical or illegal activities by employees that may have a material impact on the financial statements;

L.    Discuss with management any significant legal, compliance or regulatory matters that may have a material effect on the financial statements or the Corporation's business, financial statements or compliance policies, including material notices to or inquiries received from governmental agencies;

M.    Discuss with management the type and presentation of information to be included in earnings press releases as well as financial information and earnings guidance, if any, provided to analysts and rating agencies;

N.    Discuss with management the Corporation's policies with respect to risk assessment and risk management;

O.    Discuss the Corporation's annual audited financial statements and quarterly financial statements with management and the independent auditor, including the Corporation's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations;"

P.    Based on review and discussions with management and independent auditors, including but not limited to, receipt and discussion of items mentioned above, recommend to the Board of Directors that the audited financial statements be included in the Corporation's Annual Report on Form 10-K and approve the report required under SEC rules to be included in the Corporation's annual proxy statement;

Q.    Review the appointment and replacement of the senior internal audit executive;

R.    Establish procedures for the receipt, retention and treatment of complaints received by the Corporation regarding accounting, internal accounting controls and the confidential anonymous submission by employees of concerns regarding accounting or auditing matters; and

S.    *Act as the Audit Committee for the Corporation's insurance company subsidiaries* in accordance with the requirements of the National Association of Insurance Commissioners Annual Financial Reporting Model Regulation *and, in such capacity, review any issues relating to material weaknesses, significant deficiencies and/or significant solvency concerns at such subsidiaries, regardless of the materiality of such issues to the Corporation on a consolidated basis.* (Emphasis added.)

## SUBSTANTIVE ALLEGATIONS

29.    Markel is a holding company that markets and underwrites specialty insurance

products and programs.  MCIM, the Company's wholly-owned subsidiary, is an insurance-linked securities investment fund manager and reinsurance manager that manages diversified, collateralized retrocession and reinsurance portfolios covering global property catastrophe risks. The Company is the sole investor in all of the funds managed by MCIM, including the Markel Diversified Fund, and consolidates that fund as its primary beneficiary.  MCIM also serves as the insurance manager and holds all voting shares in Markel CATco Re., a Bermudian Class 3 reinsurance company.  MCIM also manages CATCo Reinsurance Opportunities Fund Ltd. ("CROF"), a closed-end fund in which the Company holds an investment.

30.     Loss reserves are an important metric for any insurance company to determine performance and, therefore, profitability of such a company.  Loss reserves are established to determine an insurance company's exposure based upon actuarial forecast models.  Markel and its subsidiaries, like other insurance companies, experienced a greater draw against its reserves in 2017 in part due to numerous natural weather events such as hurricanes and the wildfires in California. Markel was therefore required to modify loss reserves in late 2017 and throughout 2018.  Markel's loss reserves were presented to defendant Whitt, the Individual Defendants, and its subsidiaries.  The loss reserves were deemed sufficient and the loss reserve methodology was approved by the Individual Defendants.

31.     On July 26, 2017, Markel filed its quarterly report on Form 10-Q for the period ended June 30, 2017.  Therein, the Company reported revenue from MCIM of $9.3 million.  For the Markel Diversified Fund, it reported total assets of $186.0 million and total liabilities of $63.8 million.

32.     On October 25, 2017, Markel filed its quarterly report on Form 10-Q for the period ended September 30, 2017. Therein, the Company reported revenue from MCIM of $1.2 million. For the Markel Diversified Fund, it reported total assets of $183.3 million and total liabilities of $62.8 million.

33.     On February 23, 2018, Markel filed its annual report on Form 10-K for the period ended December 31, 2017. Therein, regarding MCIM, the Company reported revenue of $28.7

million and total assets under management of $6.2 billion. Total assets of the Markel Diversified Fund were $170.3 million and total liabilities were $62.7 million. It also reported that the fair value of the Company's investment in CROF was $20.5 million.  The Individual Defendants reviewed and signed this Form 10-K.

34.     On March 23, 2018, Markel filed its 2018 Annual Proxy (SEC Form 14A) for the purpose of electing defendants as Markel board members, securing an advisory vote on executive compensation, and approving Markel's independent auditor.   The 2018 Annual Proxy incorporated by reference the most recent Form 10-K.  Based on the 2018 Annual Proxy, all of the proposed directors were elected to the Markel board and proposed executive compensation was approved on May 14, 2018.

35.     On April 24, 2018, Markel filed its quarterly report on Form 10-Q for the period ended March 31, 2018. Therein, regarding MCIM, the Company reported revenue of $17.3 million. Total assets of the Markel Diversified Fund were $125.7 million and total liabilities were $25.4 million. The fair value of the Company's investment in CROF was $14.5 million.

36.     On July 31, 2018, Markel filed its quarterly report on Form 10-Q for the period ended June 30, 2018. Therein, regarding MCIM, the Company reported revenue of $17.4 million. Total assets of the Markel Diversified Fund were $95.2 million and total liabilities were $25.1 million. The fair value of the Company's investment in CROF was $12.0 million.

37.     On October 30, 2018, Markel filed its quarterly report on Form 10-Q for the period ended September 30, 2018. Therein, regarding MCIM, the Company reported revenue of $18.3 million. Total assets of the Markel Diversified Fund were $96.1 million and total liabilities were $25.1 million. The fair value of the Company's investment in CROF was $11.7 million.

38.     The above statements identified in ¶¶ 31-37 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Individual Defendants failed to disclose to investors that: (1) the Company's subsidiaries did not appropriately record loss reserves; (2) the loss reserves would need to be adjusted and/or restated; (3) these misleading accounting practices

would lead to regulatory scrutiny and financial loss to investors; and (4) Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

39.     On December 6, 2018, the Company disclosed that it had been contacted by the United States Department of Justice ("DOJ"), the SEC, and the Bermuda Monetary Authority ("BMA") on November 30, 2018 regarding "loss reserves recorded in late 2017 and early 2018 at Markel CATCo Investment Management Ltd and its subsidiaries."

40.     On this news, the Company's share price fell $99.70 per share, more than 8%, to close at $1048.23 per share on December 7, 2018, on unusually high trading volume. In the months prior to disclosure of the investigations, defendants Whitt, Anthony Markel, Steven Markel, Kirshner, Martin and Wilson sold Markel stock held in their individual portfolios.

41.     After the public disclosure of the investigations, several securities class action lawsuits were filed by Markel shareholders. These class action lawsuits have been consolidated under the caption: *In re: Markel Corporation Securities Litigation*, C.A. No. 1:19-cv-00319-RA, S.D.N.Y. ("Securities Class Action").

## DAMAGES TO THE COMPANY

42.     As a direct and proximate result of the Individual Defendants' conduct, Markel has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

A.     Legal fees incurred in connection with the Securities Class Action;

B.     Any funds paid to settle the Securities Class Action;

C.     Fees incurred by Markel in responding to the investigations conducted by the DOJ, SEC and BMA;

D.     Any funds for payment of penalties and amelioration related to the investigations conducted by the DOJ, SEC, and BMA;

E.     Incentive compensation paid to the Individual Defendants; and

      F.     Excessive director fees paid as a result of non-employee director compensation amounts approved by the directors who were to benefit from them.

43.    Defendants in the most recent SEC Form 10-K acknowledged that the investigations and litigation may have a material impact on Markel's financial reports and that there was a risk that there would be a significant diversion of resources and capital from Markel's operation to address the investigation.

44.    In addition, Markel's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

45.    The actions complained of herein have irreparably damaged Markel's corporate image and goodwill.  For at least the foreseeable future, Markel will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Markel's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

46.    Plaintiff brings this action derivatively in the right and for the benefit of Markel to redress injuries suffered, and to be suffered, by Markel as a direct result of breaches of fiduciary duty by the Individual Defendants.  Markel is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

47.     Plaintiff will adequately and fairly represent the interests of Markel in enforcing and prosecuting its rights.

48.     Plaintiff has continuously been a shareholder of Markel at times relevant to the wrongdoing complained of and is a current Markel shareholder.

49.     As of May 2019, when this action was filed, the Board of Markel consisted of the following thirteen individuals: Whitt, Anthony Markel, Steven Markel, Kirshner, Gayner, Martin, Lewis, Connell, Kasen, O'Reilly, Schewel, Wilson, and Leopold.  These defendants reviewed and approved the loss reserves calculated for the 2017 and 2018 time period.  The Individual Defendants failed to exercise their fiduciary duties by properly calculating loss reserves and actively misrepresenting such issues in Markel's disclosures. The Individual defendants also failed to implement internal controls for the accurate calculation of loss reserves and remain liable for the breaches of fiduciary duty set forth herein.

50.     Defendant Whitt, in addition to serving as a director, is Markel's Co-Chief Executive Officer since January of 2016 and was Markel's President and Chief Operating Officer from May 2010 to December 2015.  As such, he has and continues to derive significant income from his employment at the Company and his professional reputation is inextricably bound to his role at Markel.  Whitt has been complicit in the breaches of fiduciary duty because he actively made misrepresentations, signed Markel's public filings and certifications, and failed to institute functioning controls in the face of obvious risks.  Whitt's conduct damaged Markel. As a result, demand on Whitt is futile.

51.     Defendant Gayner in addition to serving as a director, is Markel's Co-Chief Executive Officer since January of 2016 and was Markel's President and Chief Investment Officer from May 2010 to December 2015.  As such, he has and continues to derive significant

income from his employment at the Company and his professional reputation is inextricably bound to his role at Markel.  Gayner has been complicit in the breaches of fiduciary duty because he actively made misrepresentations, signed Markel's public filings and certifications, and failed to institute functioning controls in the face of obvious risks.  Gayner is further conflicted because his spouse is employed by a Markel's subsidiary as President and Chief Executive Officer. Gayner's conduct damaged Markel.  As a result, demand on Gayner is futile.

52.     Defendant Anthony Markel has been employed by the Company since 1964 and has been a member of its senior leadership team since it went public, with a focus on operations. Anthony Markel has been Markel's Vice Chairman since 2008 and was President and Chief Operating Officer from March 1992 to April 2008.  As such, he has and continues to derive significant income from his employment at the Company and his professional reputation is inextricably bound to his role at Markel.  Anthony Markel has been complicit in the breaches of fiduciary duty because he actively made misrepresentations, signed Markel's public filings and certifications, and failed to institute functioning controls in the face of obvious risks.  Anthony Markel is the cousin of Steven Markel. Anthony Markel's conduct damaged Markel.  As a result, demand on Anthony Markel is futile.

53.     Defendant Steven Markel has been employed by the Company since 1975 and has been a member of its senior leadership team since it went public, with a focus on finance and investments.  Steven Markel has been Markel's Vice Chairman since 1992 and was President and Chief Operating Officer from March 1992 to April 2008.  As such, he has and continues to derive significant income from his employment at the Company and his professional reputation is inextricably bound to his role at Markel.  Steven Markel has been complicit in the breaches of fiduciary duty because he actively made misrepresentations, signed Markel's public filings and

certifications, and failed to institute functioning controls in the face of obvious risks.  Steven Markel is the cousin of Anthony Markel.  Steven Markel's conduct damaged Markel.  As a result, demand on Steven Markel is futile.

54.     Defendant Kirshner has been employed by Company since 1960 and has been a member of its senior leadership team since it went public. Kirshner has been Chairman of the Markel Board since it became a public company in 1986 and its Chief Executive Officer from 1986-2015. Kirshner, Anthony Markel and Steven Markel functioned collectively as Markel's senior leadership team.  As such, he has and continues to derive significant income from his employment at the Company and his professional reputation is inextricably bound to his role at Markel.  Kirshner has been complicit in the breaches of fiduciary duty because he actively made misrepresentations, signed Markel's public filings and certifications, and failed to institute functioning controls in the face of obvious risks.  Kirshner's conduct damaged Markel.  As a result, demand on Kirshner is futile.

55.     Defendant Martin has been employed by the Company since 1988 and a member of its senior leadership team since that time.  Martin was Markel's Chief Financial Officer from 1988 through 2005 and served as Markel's Executive Vice President from May 2005 to September 2009. Martin is also an advisor and consultant to the Company since stepping down as Chief Financial Officer.  As such, he has and continues to derive significant income from his employment at the Company and his professional reputation is inextricably bound to his role at Markel.  Martin has been complicit in the breaches of fiduciary duty because he actively made misrepresentations, signed Markel's public filings and certifications, and failed to institute functioning controls in the face of obvious risks.  Martin is further conflicted because Martin's son is employed by a Markel subsidiary.  Martin's conduct damaged Markel.  As a result,

demand on Martin is futile.

56. Defendants Lewis, Connell, Kasen, O'Reilly, Schewel, and Wilson were members of the Markel Audit Committee. Due to their role as members of the Audit Committee, Lewis, Connell, Kasen, O'Reilly, Schewel, and Wilson had responsibility for oversight of the Company's financial reporting and implementation of internal controls. Even though defendants Lewis, Connell, Kasen, O'Reilly, Schewel, and Wilson knew or should have known of the flawed accounting practices at Markel from their work on the Audit Committee and in particular their review and sign off on Markels public filings, they failed to sufficiently discharge their duties as Audit Committee members and ensure that this information was adequately disclosed. During the entire period for which the DOJ investigation into the 2017/2018 loss reserves was ongoing, these Audit Committee defendants were informed of the loss reserves as members of the Markel Board and served on the very committee charged with review of such transactions. Their actions expose them to significant liability. Therefore, demand on the Audit Committee defendants is futile.

57. As detailed above, the Audit Committee failed to institute sufficient processes for managing the business and financial risks created by the failure to institute functioning controls over disclosures.

58. The Individual Defendants have failed to take action against those who are responsible for permitting Markel to function without effective internal controls. No action, legal or otherwise, has been taken against any current or former director or officer in connection with the loss reserves or the process by which they were to be measured and reported. Thus, demand on the Board is futile and therefore excused because the Individual Defendants have not only demonstrated their hostility to the allegations herein through their inaction, but also through

their words.

59.     The majority of the Individual Defenddants served together on the Markel Board for the entire period under investigation by the DOJ, SEC and BMA; defendants Whitt, Gayner, Anthony Markel, Steven Markel, Kirshner, Martin, Lewis, Connell, Kasen, O'Reilly, Schewel, and Wilson have all been directors since prior to 2017 and approved loss reserves after receiving reports from management.  Thus, these directors actively participated in the wrongdoing alleged herein.  Demand on the Individual Defendants is futile and therefore excused.

60.     As particularized herein, to properly prosecute this lawsuit, the Individual Defendants would have to sue themselves and the other defendants, requiring them to expose themselves and their comrades to tens of millions of dollars in civil liability and/or sanctions. This they have refused to do thus far, and will not do in the future.  A majority of the Individual Defendants are exposed to potential liability for operating Markel without the internal controls that would have detected and prevented the improper related party transactions and misleading and belated disclosures detailed herein.  Thus, demand on the Individual Defendants is futile, and therefore, excused.

61.     The Individual Defendants have benefitted, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the substantial financial benefit derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.  Likewise, these defendants have received, and will continue to receive, substantial remuneration predicated upon their service on Markel's Board.  The acts complained of herein have resulted in substantial economic benefits to the Individual Defendants without corresponding recognition of, or accounting for, the correlated liability and risk that Markel was subject to as a result of its lack of

internal controls. The Individual Defendants, through their course of conduct to date, have demonstrated their unwillingness to seek appropriate relief for the overpayment of this compensation. Thus, demand on the Individual Defendants is futile, and therefore, excused.

62.    The Markel Board was dominated by directors that are specifically implicated in the wrongdoing alleged herein. All of the Board reviewed and approved the loss reserves. Further, a majority of the thirteen individuals (or their family members) were either: (a) Markel officers; (b) long-term former members of Markel management; (c) members of the Markel Audit Committee; and/or (d) a director on the Board for the entire period being investigated by the DOJ. As a result, the Board is dominated by persons who are specifically implicated in the wrongdoing and therefore cannot be expected to sue themselves.

63.    Markel's officers and directors, including the Individual Directors, are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Petition by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, i.e., monies belonging to the stockholders of Markel. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Markel against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Markel, there would be no directors' and officers' insurance protection and thus, they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile, and therefore, excused.

## COUNT I

### Breach of Fiduciary Duty

64.     Plaintiff incorporates by reference and reallege each and every allegation set forth above, as though fully set forth herein.

65.     Each defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Markel's business and affairs, particularly with respect to issues so fundamental as proper accounting controls.

66.     Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company.  Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Markel.

67.     In breach of their fiduciary duties owed to Markel, defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, and failed to properly oversee Markel's business, rendering them personally liable to the Company for breaching their fiduciary duties.

68.     As a direct and proximate result of defendants' breaches of their fiduciary obligations, Markel has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

### Abuse of Control

69.     Plaintiff incorporates by reference and reallege each and every allegation set forth above, as though fully set forth herein.

70.     Defendants' misconduct alleged herein constituted an abuse of their ability to

control and influence Markel, for which they are legally responsible.

71.     As a direct and proximate result of defendants' abuse of control, Markel has sustained significant damages.

72.     As a direct and proximate result of defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Markel has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, defendants are liable to the Company.

73.     By reason of the foregoing, Markel has been damaged.


## COUNT III

## AGAINST THE DEFENDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

74.     Plaintiff incorporates by reference and reallege each and every allegation set forth above, as though fully set forth herein.

75.     Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."   17 C.F.R. §240.14a-9.  Specifically, the Company's proxy statement filed on March 23, 2018 and possibly previous proxy statements since 2016, violated §14(a) and Rule 14a-9 because they included the materially false and misleading financial statements.

76.     The Proxies were false and misleading when issued because they failed to disclose (among other things) that the Company's controls over accounting and financial

disclosure were deficient and contained financial statements that were false and misleading while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties.

77.     In the exercise of reasonable care, defendants should have known that the statements contained in the Proxies were materially false and misleading.

78.     The misrepresentations and omissions in the proxy statement were material to Company shareholders in voting on the proxy statement.  The 2018 proxy statement solicited shareholder votes for: (i) director nominees; (ii) an advisory vote on executive compensation; and (iii) ratification of the appointment of the Company's independent auditor.  The proxy statement was an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties.

96.     The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the proxy statements.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all defendants as follows:

A.     Declaring that the Plaintiff may maintain this action on behalf of Markel and that the Plaintiff is an adequate representative of the Company;

B.     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Markel;

C.     Determining and awarding to Markel the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with interest thereon;

D.      Directing Markel and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Markel and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

1.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.      a provision to permit the shareholders of Markel to nominate at least three candidates for election to the Board;

3.      a proposal to establish and enforce greater internal controls over financial calculation of loss reserves, reporting of such reserves, and compliance with financial internal controls; and

4.      a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

E.      Determining and awarding to Markel exemplary damages in an amount necessary to punish the Individual Defendants and to make an example of defendants to the community according to proof at trial;

F.      Awarding Markel restitution from the Individual Defendants, and each of them;

G.      Awarding the Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

Dated: May 22, 2019

By: _____
DANIEL M. COHEN
(VA Bar No. 79836)
CUNEO GILBERT
& LADUCA, LLP
4725 Wisconsin Avenue NW
Suite 200
Washington, DC 20016
danielc@cuneolaw.com

Matthew M. Houston
Benjamin I. Sachs-Michaels
GLANCY PRONGAY
& MURRAY LLP
712 Fifth Avenue, 31st Floor
New York, NY 10019
(212) 935-7400
mhouston@glancylaw.com
bsachsmichaels@glancylaw.com

Plaintiff's Counsel

## **VERIFICATION**

I, Edwin Duffy, do hereby verify that I am a holder of common stock of Markel Corp., and was a holder of such common stock at the time of the wrongs complained of in the foregoing Verified Shareholder Derivative Complaint ("Complaint"). I have authorized the filing of the Complaint. I have reviewed the Complaint and all of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date:    5/21/2019

DocuSigned by:

*Edwin Duffy*

93CE5C9705454E4...

Edwin Duffy